**Don R. JAFFE, M.D., et al., Plaintiffs,**

v.

**Alexander E. SHARP, II, Defendant.**

**PRETERM, INC., et al., Plaintiffs,**

v.

**Michael S. DUKAKIS et al., Defendants.**

**Civ. A. Nos. 78–1637–C, 78–1653–C.**

United States District Court,
D. Massachusetts.

July 28, 1978.

Joseph J. Balliro, Joan C. Schmidt, Boston, Mass., for plaintiffs in No. 78–1637.

Joseph J. Hurley, Nutter, McClennen & Fish, Boston, Mass., S. Stephen Rosenfeld, Asst. Atty. Gen., Chief, Gov. Bureau, Boston, Mass., for defendants.

Silverglate, Shapiro & Gertner, Nancy Gertner, John Reinstein, Mass. Civil Liberties Union Foundation, Boston, Mass., for plaintiffs in No. 78–1653.

## OPINION

CAFFREY, Chief Judge.

These civil actions brought under 42 U.S. C.A. § 1983 challenge the refusal of the Commonwealth of Massachusetts to fund abortions for Medicaid recipients except when necessary to prevent the death of the mother or in cases of forced rape or incest. Both declaratory and injunctive relief is sought. The matter is currently before the Court after a hearing on plaintiffs' motions for preliminary injunctions under Fed.R. Civ.P. 65.

Plaintiffs in No. 78–1637–C include Susan Doe, Susan Doe, II, and Susan Doe, III,[1] indigent pregnant women seeking state-funded abortions; Don R. Jaffe M.D., a Massachusetts physician and authorized Medicaid provider; William Baird, an abortion counselor, and a director of plaintiff Parents Aid Society, Inc. (Parents Aid). This organization is a non-profit Massachusetts corporation which provides, *inter alia*, abortion counseling. The defendant is Alexander Sharp, II, Massachusetts Commissioner of Public Welfare.

Plaintiffs in the related case, No. 78–1653–C, are Preterm, Inc., a non-profit corporation providing clinical services including abortions for indigent women; Stanton P. Goldstein, M.D., and Shiao-Yu Lee, M.D., board-certified obstetricians and gynecologists practicing in Massachusetts; Jane Doe, a pregnant resident of Massachusetts who is Medicaid-eligible; Massachusetts Welfare Recipients for Welfare Reform (MWRWR), an unincorporated association of recipients of public assistance, and Planned Parenthood League of Massachusetts, an unincorporated agency providing, *inter alia*, abortion counseling. Defendants

---

1. The plaintiffs who filed under pseudonyms are Massachusetts residents whose true identities are on file and impounded. Affidavits filed by these plaintiffs disclose that they are now in the first trimester of pregnancy and are eligible for Medicaid financing. Affidavits also establish that physicians have deemed abortions "medically necessary" for two of the pseudonymous plaintiffs.

are Michael Dukakis, Governor of Massachusetts; John Buckley, Secretary of Administration and Finance for the Commonwealth; Gerald Stevens, Secretary of Human Services, and Public Welfare Commissioner Sharp.

Both sets of plaintiffs seek class certification under Fed.R.Civ.P. 23. In *Preterm*, the defendants have stipulated to the certification of two classes under Rule 23(b)(2):

(1) a class consisting of all Medicaid-eligible pregnant women who desire to obtain an abortion and for whom a physician has determined that an abortion is a medically-necessary service but for whom an abortion is not necessary to prevent death, and

(2) a class consisting of all physicians and other Medicaid providers whose patients desire to obtain abortions and who are willing to perform abortions which a physician has determined to be "medically necessary" but which are not necessary to save the life of the patient.

The gravamen of both complaints is the constitutionality of Chapter 367, § 2, Item 4402–5000, of the Massachusetts Acts of 1978 (hereafter ch. 367),[2] which provides:

and provided, further that no funds appropriated under this item shall be expended for the payment of abortions not necessary to prevent the death of the mother. This provision does not prohibit payment for medical procedures necessary for the prompt treatment of the victims of forced rape or incest if such rape or incest is reported to a licensed hospital or law enforcement agency within thirty days after said incident.

The plaintiffs assert that ch. 367's restriction on state funding of abortions is inconsistent with the requirements of Title XIX (commonly called "Medicaid") of the Social Security Act, as added 79 Stat. 343, and amended, 42 U.S.C.A. § 1396 *et seq.* (1970 ed. & Supp. V)[3] and is also violative of the Fourteenth Amendment's guarantee of due process and equal protection. The thrust of the defendants' response is that ch. 367 meets all statutory and constitutional requirements. Jurisdiction is invoked under 28 U.S.C.A. §§ 1331 and 1343.

The plaintiffs seek a range of preliminary injunctive relief. *Preterm* and *Jaffe* both seek to restrain the defendants from enforcing or executing that portion of ch. 367 at issue here. The *Jaffe* plaintiffs seek a general order, while *Preterm* has requested an order enjoining defendants from denying state Medicaid payments "for the rendition of medical services to indigent pregnant women for abortions which a physician has determined to be medically necessary, or to deny such payments on behalf of any such indigent pregnant women for such abortions." *Preterm* also seeks to enjoin defendants from directing notice to any Medicaid providers or to Medicaid recipients that such abortions are not reimbursable. The defendants' state their position on relief as follows:

If the court were to limit relief to the addition of one more category to the list of permitted abortions . . . then, on balance, the relief would be sufficiently narrow and precise to leave the state Medicaid provision intact. However, if the court were . . . to . . . strike the abortion proviso altogether, leaving the Medicaid appropriation available to fund all the abortions which were permitted last year, the relief would amount to a severance of the abortion proviso nowhere indicated by the Legislature.

2. Ch. 367 is part of the Fiscal Year 1979 budget for the Commonwealth of Massachusetts. It was passed, over the Governor's veto, by the General Court, *i. e.*, the legislature, on July 8, 1978. At an earlier hearing on plaintiffs' motion for a temporary restraining order, defendants informed the Court that implementation of the restrictions on funding abortions would be delayed until August 1, 1978. It should also be

noted that prior to passage of ch. 367, Massachusetts provided abortion services to Medicaid-eligible women, whatever the reason for the abortion.

3. Where code sections are referred to in this opinion without accompanying title references, "42 U.S.C.A. § ——" will be implicit.

■ To be entitled to the requested preliminary injunction, it is well-settled that plaintiffs must demonstrate a reasonable probability of success on the merits plus immediate irreparable harm which outweighs the possible harm to defendants from the Court's intervention. *E. g., Garzaro v. University of Puerto Rico*, 575 F.2d 335 (1st Cir. 1978), slip op. at 5; *Tuxworth v. Froehlke*, 449 F.2d 763, 764 (1st Cir. 1971); *Automatic Radio Mfg. Co. v. Ford Motor Co.*, 390 F.2d 113, 115–16 (1st Cir.), *cert. denied*, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).

### Success on the Merits

In order to address the statutory claim raised by plaintiffs—that Title XIX requires states which participate in the Medicaid program to fund "medically necessary" abortions [4]—it is necessary at the outset to examine briefly the interplay between Title XIX and the Massachusetts Medicaid program. Joint federal-state responsibility in the funding of Medicaid has been designated a "scheme of cooperative federalism." *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973); *King v. Smith*, 392 U.S. 309, 316, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968). While Medicaid is jointly financed, the program is administered solely by the states. Massachusetts, as a participating state, established its program "in express conformity" with the federal program. *See* M.G.L.A. ch. 118E (West & Supp.1977–78). In particular, § 6 of ch. 118E requires that the State "provide financial assistance for such medical care or services" as Title XIX and the regulations promulgated thereunder require. The Department of Public Welfare is the state agency designated under § 1396a(a)(5) to administer the state Medicaid plan.

■ Under Title XIX, the state plan must conform with certain federal statutory requirements and the accompanying regulations. §§ 1320c–13, 1396a; *Philbrook v. Glodgett*, 421 U.S. 707, 95 S.Ct. 1893, 44 L.Ed.2d 525 (1975); *King v. Smith, supra.* Specifically, participating states are required to provide medical services to certain individuals and families, *i. e.*, those eligible through such programs as Aid to Families with Dependent Children and Supplemental Security Income for the Aged, Blind and Disabled. *See* § 1396a(a)(13). Such individuals and families are designated as "categorically needy." 42 C.F.R. 249.10(a)(1). In addition to the mandatory provision of medical care to the "categorically needy," a state has the option of also providing services to those characterized as "medically needy," and Massachusetts has elected to provide such services. M.G.L.A. 118E. "Medically needy" individuals and families are those whose income exceeds that of the "categorically needy," but is nevertheless insufficient to cover medical care. § 1396a(a)(10)(B).

For those of its residents who are "categorically needy," Massachusetts is required by Title XIX to provide five general categories of medical treatment:

(1) inpatient hospital services (other than services in an institution for tuberculosis or mental diseases);

(2) outpatient hospital services;

(3) other laboratory and x-ray services;

(4)(A) skilled nursing facility services . . . for individuals 21 years of age. or older (B) . . . such early and periodic screening and diagnosis of individuals who are eligible under the plan and are under the age of 21 to ascertain their physical or mental defects, and such health care, treatment, and other measures to correct or ameliorate defects and

---

4. For a definition of a "medically necessary" abortion, plaintiffs apparently rely on the Supreme Court's statement in *Doe v. Bolton*, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973): "[W]hether 'an abortion is necessary' is a professional judgment that . . . may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health." *Id.* at 192, 93 S.Ct. at 746. *Accord, Beal v. Doe*, 432 U.S. 438, 442 n. 3, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). Plaintiffs concede that "medically necessary" requires at a minimum that a physician attest that full-term pregnancy would endanger the pregnant woman's health.

chronic conditions discovered thereby, . . . ; and (C) family planning services and supplies furnished . . . to individuals to child-bearing age (including minors who can be considered to be sexually active) who are eligible under the State plan and who desire such services and supplies;

(5) physicians' services furnished by a physician . . . whether furnished in the office, the patient's home, a hospital, or a skilled nursing facility, or elsewhere; § 1396d(a).

Although Title XIX does not require states to provide funding for *all* treatment within those five general categories, state Medicaid plans are required to establish "reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with . . . [Title XIX's] objectives . . . ." § 1396a(a)(17). It is recognized that this language bestows wide discretion on the states, subject only to the statutory requirement that state standards for determining the extent of medical assistance be "reasonable" and in conformity with the objectives of Title XIX. *E. g., Beal v. Doe, supra,* 432 U.S. at 444, 97 S.Ct. 2366 (1977).

When a state provides medical assistance for the "medically needy," as Massachusetts has chosen to do, then Title XIX provides that the state pursuant to § 1396a(a)(13) must provide either the five services listed above or any seven of a list which includes, in addition to those five,

(6) medical care, or any other type of remedial care recognized under State law, furnished by licensed practitioners within the scope of their practice as defined by State law;

(7) home health care services;

(8) private duty nursing services;

(9) clinic services;

(10) dental services;

(11) physical therapy and related services;

(12) prescribed drugs, dentures, and prosthetic devices; and eyeglasses prescribed by a physician skilled in diseases of the eye or by an optometrist, whichever the individual may select;

(13) other diagnostic, screening, preventive, and rehabilitative services;

(14) inpatient hospital services, skilled nursing facility services, and intermediate care facility services for individuals 65 years of age or over in an institution for tuberculosis or mental diseases;

(15) intermediate care facility services (other than such services in an institution for tuberculosis or mental diseases) for individuals who are determined, in accordance with section 1396a(a)(31)(A) of this title, to be in need of such care;

(16) effective January 1, 1973, inpatient psychiatric hospital services for individuals under age 21, as defined in subsection (h) of this section; and

(17) any other medical care, and any other type of remedial care recognized under State law, specified by the Secretary; . . . § 1396d(a)(1–17).

Prior to the passage of ch. 367, Massachusetts chose to provide to the "medically needy" the following from the above-listed statutory options:

1. physician's services;

2. inpatient hospital services;

3. outpatient hospital services;

4. long term institutional care;

5. home health care services;

6. physical therapy and related restorative services;

7. dental services;

8. laboratory and X-ray services;

9. kidney dialysis services;

10. sterilization;

11. drugs, durable goods and medical supplies; and

12. abortion services.

*See* Mass. Public Assistance Policy Manual, 42 Mass. Register 53–54. Those specific services are also provided to the "categorically needy" in the Commonwealth because federal law requires that a state provide to the "categorically needy" all services made available to the "medically needy." § 1396a(a)(10)(B). Section 1396a sets out

228 other minimal requirements which relate to the standards and quality of medical care and services to be provided. Title XIX does not specify further the type or extent of medical assistance which the states must furnish eligible persons. Neither pregnancy or abortion is expressly mentioned, and, in fact, the statute nowhere refers to any specific medical treatment or procedure.

█ With the above-described Medicaid structure in mind, I turn to plaintiffs' claim that Title XIX mandates that Massachusetts provide funds for "medically necessary" abortions for those state residents eligible for Medicaid. In support of their position, plaintiffs lean heavily on the Congressional statement of Medicaid's purpose, namely

> enabling each state, as far as practicable . . . to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income are insufficient to meet the costs of *necessary medical services* . . . .
> § 1396 (emphasis added).

Moreover, for the "medically needy," § 1396a(a)(10)(C)(i) requires that state plans provide "for making medical assistance available to all individuals . . . who have insufficient . . . income and resources to meet the cost of necessary medical . . . care and services." I rule that the modification of "medical" by "necessary" in both statutory references constitutes a clear statement by Congress that a medical service like abortion which a physician deems to be "necessary" for a Medicaid recipient must be publicly funded. A contrary result would fundamentally misconceive the purpose of the Medicaid program. The intent of Congress in enacting Title XIX would not be furthered by a statutory construction that requires a state to meet anything less than "medically necessary" services. On the other hand, that intent is furthered by an interpretation that the relevant statutory provisions require coverage of "medically necessary" abortions.

Another objective of the Medicaid program is to provide medical services in "the best interests of the recipients." § 1396a(a)(19). For a woman whose need for an abortion is termed "medically necessary" by the medical profession, it is likely that an abortion during the first trimester of pregnancy would be safer than carrying the pregnancy to term. *See, e. g., Roe v. Wade,* 410 U.S. 113, 149, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Furthermore, it has been stated that a woman and her physician are in the best position to decide what treatment is in her best interest. *E. g., Coe v. Hooker,* 406 F.Supp. 1072, 1081 (D.N.H. 1976). Thus, when a woman and her physician attest that an abortion is "medically necessary," M.G.L.A. ch. 367 would ignore the statutory mandate that medical services are to be offered in "the best interests of the recipients."

█ Plaintiffs further argue that the HEW regulations promulgated under Title XIX support the position that Massachusetts is required to fund "medically necessary" abortions for Medicaid recipients. Specifically 42 C.F.R. § 249.10(a)(5)(i) provides that a state must:

> Specify the amount and/or duration of each item of medical and remedial care and services that will be provided to the categorically needy and to the medically needed. . . . Such items must be sufficient in amount, duration and scope to reasonably achieve their purpose . . . the state may not arbitrarily deny or reduce the amount, duration, or scope of, such services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition. . . .

The meaning of this language is plain and unambiguous. Enforcement of ch. 367 would contravene that regulation by arbitrarily reducing the availability of abortion services deemed "medically necessary" solely because of the patient's condition or type of illness.

In answer to the contention that the language of Title XIX and its accompanying regulations require the State to fund "medically necessary" abortions, defendants respond that a recent decision involving a state statute more restrictive than ch. 367

controls this case. *D. R. v. Mitchell*, 456 F.Supp. 609 (C.D.Utah 1978). In *D. R.*, the Court rejected claims identical to those raised here. Defendants contend that the opinion in *D. R. v. Mitchell* indicates that it is unlikely plaintiffs will eventually succeed on the merits, and that therefore the preliminary injunction should be denied. The difficulty with defendants' position is that in *D. R. v. Mitchell* the Court, while thoroughly analyzing and rejecting Fourteenth Amendment claims similar to those raised in this case, gives only cursory analysis to the statutory claims and nowhere directly addresses the meaning of the accompanying HEW regulations. Therefore, defendants' reliance on that case is misplaced.

It has been frequently stated that "[t]he starting point in every case involving construction of a statute is the language itself." *E. g., Beal v. Doe, supra*, 432 U.S. at 448, 97 S.Ct. at 2370, citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 756, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). A reading of the language of Title XIX convinces me that ch. 367 frustrates the objectives of the Medicaid program. This conclusion is buttressed by the Supreme Court's statement that ". . . Title XIX's broadly stated primary objective [is] to enable each state, as far as practicable, to furnish medical assistance to individuals whose income and resources are insufficient to meet the costs of necessary medical services. *See* 42 U.S.C. §§ 1396, 1396a(10)(C)." *Beal v. Doe, supra*, 432 U.S. at 444, 97 S.Ct. at 2371.

This interpretation of Title XIX is reinforced by two other relevant considerations. First, the majority of courts that have considered the question of state funding of "medically necessary" abortions for Medicaid recipients have ruled that Title XIX requires such funding. *E. g., Zbaraz v. Quern*, No. 77C4522 (N.D.Ill., May 15, 1978); *Smith v. Ginsburg*, No. 75–0380CH (S.D.W. Va., May 9, 1978); *Right to Choose v. Byrne*, No. C3817–77 (Sup.Ct.N.J., July 7, 1978). *See also Roe v. Casey*, 464 F.Supp. 483 (E.D.Pa.1978) (Pennsylvania enjoined via a temporary restraining order from refusing to reimburse providers of "medi-

cally necessary" abortions); *Emma G. v. Edwards*, 434 F.Supp. 1048 (E.D.La.1977).

Secondly, in the non-abortion context, it has been consistently held that Title XIX requires payment for all "medically necessary" procedures. *E. g., White v. Beal*, 555 F.2d 1146 (3d Cir. 1977); *Rush v. Parham*, 440 F.Supp. 383 (N.D.Ga.1977); *Dodson v. Parhan*, 427 F.Supp. 97 (N.D.Ga. 1977). As the Court stated in *Rush v. Parham, supra*, under Title XIX "[M]edicaid coverage is not optional or discretionary for necessary medical treatment of eligible individuals. . . . . Benefits for medically necessary services . . . are the irreducible minimum coverage which the states must provide." *Id.* at 389. Therefore, I rule that plaintiffs have shown that they have a reasonable probability of success on the statutory claims. At this stage, I make no ruling on the complex constitutional claims raised herein, mindful of the well-established preference for statutory rather than constitutional resolution of controversies. *See, e. g., Wyman v. Rothstein*, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970) (per curiam); *Rosado v. Wyman*, 397 U.S. 397, 402, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

### Irreparable Harm

If a preliminary injunction does not issue, affidavits on file establish the potential of irreparable injury to those plaintiffs now in the first trimester of pregnancy. The Supreme Court has stated: "Time, of course, is critical in abortion. Risks during the first trimester of pregnancy are admittedly lower than during the later months." *Doe v. Bolton*, 410 U.S. 179, 198, 93 S.Ct. 739, 750, 35 L.Ed.2d 201 (1973). *See also* M.G.L.A. ch. 112 § 12M. Moreover, the risk of irreparable injury to the health of the presently-pregnant plaintiffs outweighs any claimed hardship to defendant, and, in fact, defendants have claimed no injury.

It has been observed with respect to an application for preliminary injunction that: "it is not necessary that the plaintiff's right

to a final decision, . . . be absolutely certain, wholly without doubt . . . it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *American Medical Assoc. v. Weinberger*, 395 F.Supp. 515, 525 (N.D.Ill.), *aff'd*, 522 F.2d 921 (7th Cir. 1975), *citing Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953).

■ Accordingly, the application of plaintiffs for a preliminary injunction should be allowed. A preliminary injunction will therefore issue pending the disposition of this case on the merits. The precise wording of that injunction raises a further issue. In December of 1977, Congress enacted the Hyde Amendment to the HEW appropriation bill. That amendment contains the following restrictions on federal funding for abortions:

> None of the funds contained in this Act shall be used to perform abortions except when the life of the mother would be endangered if the fetus were carried to term; or except for such medical procedures necessary for the victims of rape or incest, when such rape or incest have been reported promptly to a law enforcement agency or public health service, or except in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians.

> Section 209 of Pub.L. 95–205; 91 Stat. 1460 (Dec. 9, 1977).

While this is not technically a part of Title XIX, nonetheless it is a clear statement of Congressional intent in the area of federal funding for abortions. As such, it would be anomalous for this Court to strike down ch. 367 for nonconformity with federal law which now limits federal funding for abortions and thereby create a situation where *all* abortions sought by state Medicaid recipients would have to be completely funded by the Commonwealth. The defendants have taken the position that should an in-

junction issue, the Court should modify ch. 367 to reflect the intent of the Massachusetts legislature. To do so, an Order will enter adding the third exception contained in the Hyde Amendment to ch. 367 so that state funds will also be available to pay for abortions for Medicaid recipients:

> in those instances where severe and long-lasting physical health damage to the mother would result if the pregnancy were carried to term when so determined by two physicians. *Id.*

This I believe is what the state legislature would have intended had that body realized that ch. 367 conflicted with the objectives of Title XIX and was for that reason unenforceable as passed.

■ Because the plaintiffs' motion for a temporary restraining order pending decision on the motion for preliminary injunction is now moot, the motion for a temporary restraining order will be denied. This opinion is written and filed to satisfy the provisions of Rule 52(a) of the Federal Rules of Civil Procedure requiring the Court to set forth its findings of fact and conclusions of law constituting the basis for its action.

Two procedural questions remain to be resolved at this point. First, a motion to intervene has been filed. I will withhold final decision on that motion, but permit the would-be intervenors to submit *amicus curiae* memoranda on the claims raised herein. The Court also requests that HEW submit such memoranda.

■ Second, defendants have raised questions regarding the standing of the various plaintiffs in the *Jaffe* case. Insofar as plaintiff Baird is concerned, defendants contend that despite his activities as a pro-abortion activist, he neither alleges nor could allege injury to himself by ch. 367. It is well-recognized that this Court's jurisdiction cannot be invoked unless a plaintiff has himself suffered "some threatened or actual injury resulting from the putatively illegal action." *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Additionally, a plaintiff cannot or-

dinarily rest his claims on the rights of third parties. *E. g., Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Barrows v. Jackson*, 346 U.S. 249, 255, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). Therefore, since Baird has alleged no facts showing that he is adversely affected, I rule that he lacks standing to maintain this action.

I also rule that the plaintiffs Susan Doe and Susan Doe, II, lack standing because they allege no facts in the complaint or supporting affidavits to show that their pregnancies should be terminated by abortions under any standard of "medical necessity." Thus, their interests in the case fall beyond the "zone of interests to be protected . . . by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). Under prevailing law, the most those guarantees protect or mandate are "medically necessary" abortions for Medicaid recipients. *See, e. g., Maher v. Roe*, 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977); *Beal v. Doe, supra*. Susan Doe, III, and her doctor have alleged facts in their supporting affidavits which tend to establish her standing.

Since the complaint avers that Dr. Jaffe is an authorized Medicaid provider, insofar as his own rights are concerned, he has standing under the Supreme Court's holding in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976): "there is no doubt now that . . . physicians suffer concrete injury from the operation of the challenged statute." *Id.* at 112–113, 96 S.Ct. at 2873. Moreover, the precise issue before the Court in *Singleton* was whether Medicaid providers had standing to assert the rights of their patients. Reasoning that "[a] woman cannot safely secure an abortion without the aid of a physician, and an impecunious woman cannot easily secure an abortion without the physician's being paid by the State," *id.* at 117, 96 S.Ct. at 2875, the Court expressly held that "it generally is appropriate to allow a physician to assert the rights of women patients as against

governmental interference with the abortion decision." *Id.* at 118, 96 S.Ct. at 2876. Thus, I rule that Dr. Jaffe has standing to sue on his own behalf and on behalf of his women patients.

Insofar as Parents Aid is concerned, the organization *qua* organization nowhere alleges any "injury in fact" from which this Court could find a sufficiently concrete interest in this controversy to meet Article III's requirements. If the organization bases its claim on *jus tertii* rights, any third parties it seeks to represent are already represented in this matter. *See Singleton v. Wulff, supra*. Therefore, I rule that Parents Aid lacks standing.

One final comment is in order. I note that one of the objections raised by defendants against conferring standing on any of the *Jaffe* plaintiffs is the following:

> Should the attacks on c. 367, § 2, ultimately prevail on the merits, plaintiffs' counsel will have a claim for attorneys' fees under 42 U.S.C. § 1988 . . . the litigation could . . . consum[e] thousands of hours of lawyers' time. Assuming *arguendo* the Commonwealth's obligation to pay attorneys' fees, the amount should not be inflated unfairly by maintenance of duplicative suits.

To obviate that possibility, a hearing will be held on August 28, 1978, at 2:00 P.M., on the pending class certification issue. At that hearing, all parties now remaining in this action should address particularly the question of possible duplicative effort.

Order accordingly.